Tbe opinion of tbe Court was delivered by
WITHERS, J.
When it is remembered that tbe sole question in this case is, whether tbe paper propounded as tbe last will and testament of Elijah Willis, should be admitted to probate, many of tbe topics, and tbe discussion that has attended them, must vanish, as irrelevant to tbe proper subject before us. Upon tbe question of probate tbe inquiry is, whether there be propounded a valid will; not whether certain of its provisions are against tbe law, statute or common, or against any such State policy as a‘ Court may notice. These last considerations belong to construction and administration, . and, however they may operate to explode certain provisions, yet, if enough remains to make a will or testament, the, same is undoubtedly entitled to probate. Whether we take onedefinition or another of a will — as that adopted *194 bj Cb. Kent, “a disposition of real and personal property, to take effect after the death of the testator,” or that derived from the Boman law and approved by Swinburne, Godolphin and Black-stone, especially for its precision, “the just sentence of our will touching what we would have done after our death” — it is always true, that if valid in part, though void in part as to its provisions, it is a will; and if it be, probate and letters to executor, or to one in lieu of him, should be issued.
Where it becomes necessary to draw from the contents of a paper presented as a will, evidence touching its due execution and validity as such, any tribunal charged with the examination of that subject, is authorized to scrutinize the contents. As, for example, whether a provision in the paper may affect the competency of an attesting witness, and whether the statute of 25 Greo. 2, applies to make the witness a good one; whether all that is presented was executed by the testator, or a portion was not and has been surreptitiously interpolated; whether the contents be such as render the paper wholly void, by force of a statute, if any such there be, and the like. But if the paper be duly executed by one competent, agreeably to the forms prescribed, and in the presence of the requisite number of credible witnesses, and contain the revocation of all prior wills and the appointment of an executor, (as the testamentary paper before us does,) and be silent, in fact, or for want of validity, as to all other matters, it is a will, and must be admitted to probate accordingly.
This is not denied by those who oppose Jolliffe, the executor ; but they say that the paper in question is void in all its parts, because, first, its provisions show it to be at war with the settled policy of this State as to slavery and emancipation; and, second, those provisions make it void in whole, by virtue of the words of the fourth section of the Act of Assembly, 1841, as follows: “Every devise or bequest to a slave or slaves,'or to any person upon a trust or confidence, secret or *195 expressed, for tbe benefit of any slave or slaves, shall be null and void.”
1. Tbe first “item” of tbe paper before ns is in contravention of tbe first section of tbe Aot of 1841. But tbe evidence shows that such provision, (which bequeathed certain slaves to tbe executors, to be carried to Ohio, and there emancipated,) has been superseded by the testator himself, who carried said slaves to Ohio in his lifetime, there left them, and there they remain, so far as we know. That this very item was not in conflict with the “policy of this State,” prior to the Act of 1841, cannot be affirmed, except by over-riding the decision of Frazier vs. Executors of Frazier, 2 Hill, Ch. 204. However such provision in a will may contravene the first section of the said Act of 1841, it is quite material to inquire what consequence follows? Not that the whole will shall be void, but -(says that Act) that slaves bequeathed to executor for removal and emancipation, “ shall become assets in the hands of any executor or administrator, and be subject to the payment of debts,” or to distribution or escheat as the case may be.
Here, then, is one of the latest prohibitions against emancipation, and the design to procure it by means of explicit testamentary provision; and yet when (not the policy of the law, but,) its express words are violated, the whole will is not annulled, but is “utterly null and void to the extent of such provision;” and the executor is expressly recognized and held to the execution of a trust legislatively substituted for that vacated, to wit: to hold the slaves, whose emancipation is intercepted, as assets for payment of debts, for distribution, or for escheat. It is thus manifest that if the slaves transported to Ohio by Elijah Willis, in his life-time, were now here, and in the hands of his executor, the will of the deceased would not be void, in toto, on that account; but by plain words in the Act of 1841, would subsist for such purposes as should be lawful. If, therefore, a will containing such provision, and applicable to an existing state of things, be not *196 excluded from probate bj tbe last and most concentrated exposition of tbe legislative will, or tbe “ policy of tbe State,” bow shall we exclude from probate a will, tbe obnoxious provision of wbicb, now in view, is rendered null by tbe act of testator, by virtue of a supposed policy to be extracted from an antecedent -course of legislation, gradually becoming more stringent, it is true, against tbe emancipation of a slave, but far more mitigated in every feature and at every step than tbe Act of 1841 ?
We bave been led to use tbe terms “policy of tbe State,” because a ground of appeal and much argument employed to support it, suppose that tbe proffered will meets total destruction from that source. If more be meant by “ policy,” than tbe will of tbe sovereign power, as ascertained by fair construction of constitution or statute proclaiming that will, it is prudent to say tbat, as a Court we bave no other source of information as to any thing tbat may be called policy; tbat no safe rule of decision, in a particular case touching tbe rights of individuals, can be derived from tbe arena of politicians — from tbe beat and light of a current contest, however intense and however momentous tbe subject, and tbe consequence involved; from any condition of public opinion, co-extensive though it be with tbe limits of tbe State, but as yet not moulded into the semblance and substance of law. In fact, if tbe thing be possible, tbe more exasperated may be tbe political contests of people or States, while engaged in tbe form of high debates, tbe calmer should it be our duty to preserve tbe judicial atmosphere when tbe question enters tbe forum, where it must rest alone upon existing law. Ee-sorting, then, to our only source of ascertaining “ policy,” or a legitimate rule of decision, to wit: tbe statutes as to emancipating a slave, we might say, were it required for tbe case, tbat it would be difficult to find in any or all our Acts of Assembly, such restraint upon tbe right of slave property as prohibited tbe master from carrying bis slave to Ohio, and *197 clothing him with sticb freedom as.be could there bestow.' But we hare seen already that any opinion upon this subject will not settle the question of probate claimed for the. will propounded; that if this effort to emancipate had been left fox the executor to undertake, and the slaves so to be disposed of were here in his hands, nevertheless jerobate must be granted ; the first section of the Act of 1841, contemplates it. There is an executor appointed: he is charged by law, as well as by the will, with payment of debts: he is by law invested with the legal property in personalty, to be held for the trusts of the will if lawful, and so far as they are so, which cannot be decided upon a question of probate; and, consequently, if this Court were to explore a proper or improper field for the policy of the State, it would, for the purposes of the present question, be a fruitless exercise, however otherwise engaging.
But second — Does the fourth section of the Act of 1841, utterly destroy this will ? Its terms have been quoted. To maintain this position, the argument assumed, and was obliged to assume, that “ devise” meant will, and that “ bequest” meant testament; fox a devise or bequest for the benefit of a slave is declared null and void. Chancellor Kent, in Lecture 68, first paragraph, observes as follows: “When the will operates upon personal property it is sometimes called a testament, and when upon real estate, a devise, but the more general and the more popular denomination of the instrument, embracing equally real and personal estate, is that of last will and testament.” If it be admitted that in certain instances and circumstances the words in question may have been used as is contended, still, without weighty reason, we should not wrest them from the more popular and general sense; and that certainly is, that they mean provisions in a will and testament; much less should we disregard what may be here considered the context, to wit: the first and third clauses of this Act. They certainly distinguish *198 between bequest and will or testament, and tbe first section expressly uses tbe word “ provision" as equivalent to bequest, or deed of trust or conveyance, and confines tbe word bequest to tbe particular kind of bequest described. There is no reason to enlarge tbe meaning in the fourth clause beyond that in tbe first; no more reason that a will should totally perish because of one provision, devise or bequest, than the other. It would, indeed, be most unreasonable to bold that a will should totally fail, in all its studied and benificent provisions, merely because a small gratuity should be specified for a favorite slave; and such would be the consequence of the rule of construction which is urged upon us. Surely it is enough to subserve any ideas of policy or any necessary or reasonable sense of this law, to apply it only to the obnoxious provision, by way of devise or bequest, that the great right of testamentary disposition may not be too boldly invaded; ut res magis valeat quarn pereat.
If, however, the interpretation proposed be allowed, another essential question lies behind; one of no little consequence, to wit: whether the beneficial interest, the trust, be for the benefit of slaves; and if that be resolved in the affirmative, still another question remains, to wit: if the appointed trust fails, whether the executor must not hold for the next of kin, (supposing he cannot take beneficial interest to himself,) or in case there be no legatee or distributee capable to take, whether he must not hold subject to the right of the State on escheat. Now whether the slaves carried to Ohio by Willis have thereby acquired the status of freedom, and so can take the legacy designed for them, is a matter that would call for grave consideration, on which we need not decide upon this mere question of probate, and which we ought not to prejudge, since it may become, probably is pending, as a distinct question in another forum. We have been referred to much learned discussion, more or less directly bearing upon the question, but from what is already said it’ is apparent that its *199 discussion now and here would be merely voluntary. But if sucb questions as are herein indicated do or may arise upon the construction of the paper in question, and when, as has been shown, their determination in any way leaves still what may be a good will, is it not an argument to ask, how can they be appropriate to a proceeding for probate ?
The foregoing must serve to dispose of all the positions that seek a foundation in the Act of 1841.
The other points taken, concern the evidence upon the questions of fraud upon the testator, undue influence, and incapacity by reason that he was insane.
As to fraud — There was none upon Willis as to what the will contained. It was executed in duplicate. One copy was read while he had before his eyes the other. He retained one, the other was left in Cincinnati, where it was admitted to probate. But it was surmised that there was evidence tending to show that Jolliffe, the appointed executor, had designs to devise some means whereby he should' cause the body of testator’s slaves, now in Barnwell District, and whom he is directed to sell, to be' emancipated. Whether the evidence affords good ground to believe that such is Jol-life’s design, we do not determine; but assuming it as established, it is presumed that those thereunto moved by interest know how to enforce the due and honest execution of trusts by Jolliffe, and the conclusive answer is, that the infidelity of Jolliffe cannot make a fraud upon the testator in the execution of the will.
As to undue influence — The testimony is wholly silent as to any such influence over Elijah Willis in the matter of his will, unless it can be imputed to the negro woman Amy, whom he allowed, though his slave, to occupy a level with himself, and to become the mother of his childen, or unless something of that kind can be derived from the provisions of the will. The substance of the evidence upon this point is found grouped in the report; and when it is remembered that the will was made *200 in Cincinnati in the absence of Amy, more than a year before the testator’s death, a copy retained by him during the whole time; and when we advert to the numerous cases in our own books, of a character so much stronger than this, where this objection has been overruled, it would be a waste of time to argue the subject. There is no evidence that the testamentary paper was not the free and voluntary act of the testator; nor can the disgust which is properly felt at the course of conduct that supplied the motive to make such provisions as the will contains, in favor of such beneficiaries, be permitted to blind us to the fact, that such motives and such provisions and such objects of bounty were perfectly consistent with the unconstrained pleasure and natural sentiments of such a man as Elijah Willis was.
As to insanity, it appears to this Court that there is quite as little ground (to say the least of it) to impute that, as there is to allege undue influence. If, as already said, the contents of the will show nothing inconsistent with such reason and natural emotion as might control a man in the unhappy and disreputable condition of Willis, it was not insanity in him, to obey their dictates. Nor can this be found in the fact that, in his efforts to confer freedom and fortune upon his negro slave mistress and his own children by her, he also included their half-brothers; and that their grand-mother also, so far as transportation to Ohio is concerned, subsequently attracted his attention, and he carried her with the rest. If he had determined to sell Amy and her children, it would have been in accordance with the prevailing sentiment among us to include in the transfer Amy’s mother likewise. It is not at all strange, therefore, that he included her in the party that he carried to Ohio. Not in the least does it argue insanity that Willis should resort to such a man as Jolliffe, under the advice (as it is said) of Mr. Olay. To what other description of people should he apply to aid in the object he had in view? He could not find suitable co-adjutors in the next of kin here, *201 and would be met by tbe opposition of tbe law, and no doubt that of individual and general sentiment in any trust be might attempt to lodge in any one witbin tbis jurisdiction, calculated to carry out bis natural designs; and, therefore, however be may have detested Abolitionists, be relented so far as concerned Amy and her family, and circumstances drove him to a place and people beyond tbe limits where slavery prevails to find tbe aid which he needed; but as respects tbe slaves left by him in tbis State, be did not adopt tbe advice pressed upon him by Harwood to free them.
As to tbe moody silence and reserve; tbe avoidance of society; a sigh when be beheld tbe living examples .of bis shame, and such like exhibitions, reported by certain witnesses, it is most obvious that tbe more rational bis reflections and forecast, when be contemplated tbe channel through which be must band down bis blood to posterity, and tbe probable fortune of those who bad sprung from him, tbe deeper must have been bis gloom, tbe more bitter bis remorse. Advancing age and approaching death could but heighten their intensity— surely we have no warrant to trace such circumstances to insanity.
As to tbe objection that tbe paper propounded is not sufficiently identified, by unobjectionable evidence as a copy of tbe will executed in duplicate in Cincinnati, (and with exact formality it is not denied,) it is enough to say, we can see no plausible foundation for such objection.
It results that we can discover no legal basis upon which tbe verdict can stand; we apprehend it may be due to tbe idea tbe jury bad of an insuperable obstacle to be found in notions of State policy, or in tbe provisions of tbe Act of 1841, neither of which affords them any foundation; and we, therefore, order a new trial.
O’Neall, Wardlaw, WhitNer, Glover and MuNro, JL, concurred.
New trial ordered.